## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

MATTHEW J. DONLIN,

        **Plaintiff,**

vs.                                         **Civ. No.  17-395 JCH/JHR**

PETCO ANIMAL SUPPLIES STORES, INC.
A Foreign Profit Corporation,

        **Defendant.**

### <u>MEMORANDUM OPINION AND ORDER</u>

This employment case is before the Court on Defendant's *Motion for Summary Judgment* (ECF No. 52). At issue is whether the Defendant, Petco Animal Supplies Stores, Inc. ("Petco"), violated the statutory and common law rights of its former employee, Plaintiff Matthew J. Donlin ("Donlin"). Donlin asserts Petco violated statutory rights protected by the New Mexico Human Rights Act ("NMHRA"), N.M. Stat. Ann. § 28-1-7(A), Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, and Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2614 & § 2615(a), f. Having considered the motion, briefs, evidence, and applicable law, the Court concludes that there are genuine issues of material fact as to whether Petco's failure to reinstate Donlin to his position on May 10, 2015, after taking FMLA leave, violated the NMHRA, ADA, and FMLA, and therefore the motion for summary judgment should be denied as to those claims. The Court, however, will grant Petco's request for summary judgment to the extent the NMHRA and ADA claims are based on Petco's failure to reinstate Donlin to his position in August 2015 and on Petco's termination of Donlin's employment in January 2016 for failing to submit needed information concerning his November 2015 medical restrictions. As for Petco's request for summary judgment on Donlin's

retaliatory discharge claim, the Court will reserve ruling until the parties file additional briefs on the issue of causation.

## LEGAL STANDARD

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is considered material if it may affect the outcome of the case based on the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *See Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013). In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmovant. *See Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015). When "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Cassara v. DAC Servs., Inc.*, 276 F.3d 1210, 1212 (10th Cir. 2002) (internal quotations omitted). The burden then shifts to the opposing party to come forward with admissible evidence to create a genuine issue of material fact on that element. *See id.*

## FACTUAL BACKGROUND[1]

Petco hired Donlin as a Sales Associate in 2004, eventually promoting him to General Manager in 2006. Def.'s Mot. for Summ. J. ("MSJ"), Undisputed Fact ("UF")[2] ¶ 1, ECF No. 52; Pl.'s Dep. 32:11-20, ECF No. 54-1. In about 2014 or 2015, Donlin transferred to the Albuquerque store and reported to District Manager Rick Coughlin. Def.'s MSJ, UF ¶ 2, ECF No. 52.

---

[1] The facts set forth herein are those in favor of Donlin, the non-moving party.
[2] "Undisputed Fact" refers to those portions of facts set forth in the numbered statement of facts section in Defendants' Motion for Summary Judgment that Plaintiff did not dispute in his response.

## I.      Donlin's Medical Condition and Leave of Absence

Dr. Sharon Nunez began treating Donlin in 2010 and she diagnosed him with osteoarthritis, sciatica, and fibromyalgia, a serious, chronic pain condition. Def.'s MSJ, UF ¶ 7, ECF No. 52; Nunez Dep. 6:13-8:18, 9:22-11:18, ECF No. 54-4. Although Donlin was always in pain, his condition fluctuated day to day, and he was generally able to manage it and work. *See* Nunez Dep. 19:11-23, 38:23-41:2, 139:4-16, ECF No. 54-4. When his pain flared up and was high, his work duties took longer. Pl.'s Dep. 76:9-77:17, ECF No. 54-1. To compensate for his difficulties concentrating, he at times worked 9-to-10-hour days, instead of his ordinary 8-to-9-hour days. *See* Pl.'s Dep. 285:15-286:12, ECF No. 54-1. When Donlin had flare ups, he usually was able to recover from them with two or three days of rest or change in activity. Nunez Dep. 46:15-47:2, ECF No. 54-4. Donlin worked successfully as a Petco General Manager for approximately five years with his fibromyalgia diagnosis. Pl.'s Resp., UF ¶ AA, ECF No. 54.[3]

In early 2015, Donlin suffered a severe flareup of his fibromyalgia, so Dr. Nunez recommended he take a leave of absence from work. *See* Nunez Dep. 22:22-26:2, ECF No. 54-4. Around February 12, 2015, Donlin requested 2-3 weeks of FMLA leave. Def.'s MSJ, UF ¶ 10, ECF No. 52. Dr. Nunez certified that Donlin was unable to perform his job functions during the severe flare, specifically standing, sitting, and handling multiple tasks. *Id.* Petco granted Donlin's request for FMLA leave and he received short-term disability benefits from UNUM, Petco's third-party disability insurance provider, which made all decisions about benefit eligibility independently. *Id.*, UF ¶¶ 11-13. Donlin subsequently requested extensions of his FMLA leave,

---

[3] Plaintiff's "UF" refers to facts set forth in Plaintiff's response that Defendant did not dispute in its reply.

which Petco repeatedly granted until he exhausted his 12 weeks of FMLA leave on May 9, 2015. *Id.*, UF ¶¶ 14-17.

## II.   Petco's Return to Work Policy and Job Description

Petco's Leave Team is responsible for all return-to-work and accommodation decisions. Pl.'s Resp., UF ¶ H, ECF No. 54. According to Petco's return-to-work policy, when it receives a full duty return to work release (a release without restrictions), the employee is returned to work without further ado. Pl.'s Resp., UF ¶ H, ECF No. 54. If the employee has been released with restrictions, the Leave Team's next step is to start interactive discussions – to obtain feedback from either the employees' supervisor, store leader, district manager, or Human Resources ("HR") Business Partner to determine what the actual job consists of and the ability to accommodate those restrictions. *See* Pl.'s Resp., UF ¶ H, ECF No. 54; Puente-Sandoval Dep. 8:5-9:18, ECF No. 54-2; Radcliffe Dep. 12:6-9, ECF No. 52-5. Once Petco receives feedback, it circles back with the employee to provide next steps. *See* Puente-Sandoval Dep. 8:17-18, ECF No. 54-2. When a return-to-work release form includes restrictions that are not clear, Petco provides the employee an accommodations packet to assist with getting clarification so that Petco can evaluate possible accommodations. Def.'s MSJ, UF ¶ 30, ECF No. 52. When sufficient information is available to determine what accommodations can be made, Petco provides those accommodations so the employee can perform his job. *Id.*, UF ¶ 31. Petco considered returning an employee to work with the restriction as an accommodation; for example, an accommodation of assistance when lifting something over 25 pounds when a 25-pound lifting restriction is in place. *See* Radcliffe Dep. 82:24-83:23, ECF No. 52-8.

## III.   Donlin's Duties as a General Manager

Petco's written job description for the General Manager position listed as "Essential Job Functions" that the "candidate must demonstrate, with or without an accommodation," the following: (i) interact professionally through written and verbal communications; (ii) hire, train, develop, manage, and motivate a sales team through effective management and customer service; (iii) accomplish multiple management tasks in a timely manner by planning and managing workload, delegating work, and supervising subordinate managers and associates; (iv) exercise good business and personnel management skills; (v) meet and manage store profitability projections and shrink budgets; (vi) have an interest in animal welfare; and (vii) move merchandise up to 50 pounds. Def.'s Ex. 3, ECF No. 52-3. The General Manager's responsibilities included management of employees; complaint resolution; customer service; reporting; inventory control and management; ensure the proper healthcare, appearance, and maintenance of companion animals; cash handling; store opening/closing; store merchandising; providing for safety of customers, employees, livestock, and property; housekeeping oversight; and marketing. *Id.* at 4-6 of 8. The job description also warned that the position "requires bending, kneeling, moving merchandise (up to 50 pounds, as necessary) and standing for long periods of time." *Id.* at 7 of 8. Plaintiff acknowledged that the written job description was an accurate reflection of his job. Donlin Dep. 41:11-20, ECF No. 52-1.

In practice, approximately 95% of Plaintiff's tasks were performed in the office – a very clerical job. *See* Pl.'s Dep. 37:3-13, ECF No. 54-1. More specifically, the general manager duties were scheduling, reading and filling out reports, gathering numbers on the sales floor and inputting them into a computer, inventory control, shrink control, overseeing the grooming salon, scheduling for the grooming salon and employee shifts, responding to emails, reading and responding to action memos, performing reviews and evaluations of employees. *See* Pl.'s Dep. 32:23-33:3, 37:3-39:2,

5

ECF No. 54-1. Donlin's General Manager functions also included completing and submitting all accounting, payroll reports, and managing all cash. Def.'s MSJ, UF ¶ 3, ECF No. 52.

The Petco store Donlin managed had approximately 20-25 total employees, and there were always at least four employees working in the store. Pl.'s Resp., UF ¶ LL, ECF No. 54. At any given time, employees were available to perform needed manual labor of unloading the truck, shelving merchandise, and assisting customers with merchandise without the need for Plaintiff to perform those tasks. *Id.* Although Plaintiff had willingly moved merchandise up to 50 pounds on the job, it was very rare because there were always sales associates on the floor. *See* Pl.'s Dep. 42:9-19, 288:14-289:9, ECF No. 54-1. Similarly, he had once climbed a ladder to get merchandise, but usually sales associates handled the stocking on the sales floor, not the general manager. *See id.* at 159:20-160:15. As General Manager, Plaintiff also ran the cashier; walked for more than 30 minutes; stood for more than 30 minutes; kneeled, crouched, and squatted; and travelled. *See* Donlin Dep. 41:2-4, 122:3-9, 124:6-15, 125:13-25, 128:1-3, ECF No. 52-1.

**IV.    Donlin's Request to Return to Work and Work Restrictions**

On May 5, 2015, Donlin submitted a return-to-work release in which Dr. Nunez identified a number of work restrictions expected to last through August 10, 2015: no lifting, lowering, or carrying over 10 pounds; no pushing or pulling over 10 pounds; no exposure to chemicals; no kneeling, crouching, or squatting; no repetitively bending or twisting at the waist; walking less than thirty minutes per hour; standing less than thirty minutes per hour; no operating a hand truck; and no flying or driving. Def.'s MSJ, UF ¶ 21, ECF No. 52. Ms. Christina Puente-Sandoval, Petco's leave coordinator, received the form and sent an email to Donlin's District Manager, Daniel Bleau, and Matt Hazlett, the HR business partner, about whether they thought the restrictions could be accommodated. *See* Puente-Sandoval Dep. 18:15-22:14, ECF No. 54-2. They

responded that Petco could not accommodate the restrictions, but they did not inform Donlin why or explain what restrictions had to change to return to work. *Id.* at 28:1-8, 32:23-34:5; Pl.'s Resp., UF ¶ M, ECF No. 54.

While Plaintiff is not aware of any written Petco policy requiring an employee to certify that he is 100% fit for work, Daniel Bleau told Plaintiff in May that he needed to submit a return to work release without restrictions if he wanted to come back to work. *See* Pl.'s Resp., UF ¶ I, ECF No. 54; Pl.'s Dep. 100:25-102:21, ECF No. 54-1; Pl.'s Dep. 102:12-104:20, ECF No. 52-1. Because Mr. Bleau was his manager and boss, Plaintiff interpreted his words as being from the company. *See* Pl.'s Dep. 103:10-18, ECF No. 54-1. Plaintiff also received emails from the Leave Team asking if he had been fully released. *See id.* at 102:18-103:25. In response to Donlin's question about his job status, Ms. Puente-Sandoval told him that his leave would be extended, and that if he were cleared to return to work after his job protection ends, then at that time they would determine what positions were available and for which he qualified. Puente-Sandoval Dep. 36:2-10, ECF No. 54-2. Petco said to contact them if his restrictions changed, so they could re-evaluate, but in the meantime, they extended his leave of absence through August 10, 2015, with a return to work date of August 11, 2015. Pl.'s Ex. 5, ECF No. 54-5 at 13-14 of 15; Pl.'s Dep. 132:9-25, 133:8-14, ECF No. 52-1. Because Donlin understood that Petco would not allow him to return to work unless he was 100% fit, he did not contest the restrictions or seek an accommodation at that time. *See* Pl.'s Dep. 101:9-102:15, 135:2-6, 136:16-137:1, 143:12-144:2, ECF No. 54-1. However, on May 7, 2015, Donlin sent two emails to Randy Chambers, Vice President of Operations of Petco, complaining about his difficulties with UNUM, Def.'s Ex. C, ECF No. 56-4, and that he "received no support from the Ethics Department, no support from the Benefits Department, I am not receiving the Short Term disability from UNUM in a timely and professional manner, I have

been informed that I cannot work, that my job and position are no longer safe due to my disability, and that [there] may not be a position for me when I come back." Donlin Decl. & Pl.'s Ex. A, ECF No. 54-7 at 1-2 of 2.

On July 21, 2015, Dr. Nunez completed another return-to-work release with a return to work date of August 10, 2015. Def.'s MSJ, UF ¶ 24, ECF No. 52. In it, Dr. Nunez again identified multiple restrictions to last through November 10, 2015. *Id.* Many of the restrictions were the same or similar to the previous restrictions, including: no lifting, lowering, or carrying over 10 pounds; no pushing or pulling over 10 pounds; no exposure to chemicals; no kneeling, crouching, or squatting; no repetitively bending or twisting at the waist; walking less than thirty minutes per hour; standing less than fifteen minutes per hour; no operating a hand truck; and no flying or driving. *Id.* Dr. Nunez also expanded the restrictions by adding no repetitive power gripping or grasping; no repetitive hand, wrist, or elbow motion; no excessive noise; no reaching above shoulder level; no climbing stairs or ladders; no using foot controls; and avoiding tasks that require fine attention to detail. *Id.*

After receiving the form, Ms. Puente-Sandoval asked Mr. Hazlett and Mr. Coughlin by email if they were able to accommodate these restrictions, and Mr. Coughlin responded that they cannot. Pl.'s Ex. 5, ECF No. 54-5 at 9-10 of 15; Puente-Sandoval Dep. 46:5-48:18, ECF No. 54-2. Ms. Puente-Sandoval had no further communications with Mr. Coughlin or Mr. Hazlett regarding this denial of accommodation or Dr. Nunez's restrictions. *See* Puente-Sandoval Dep. 46:5-49:18, ECF No. 54-2. Ms. Puente-Sandoval informed Donlin that the restrictions cannot be accommodated at this time, they will extend a leave of absence, and to contact her with any questions. *Id.* at 49:21-52:13; Pl.'s Ex. 5, ECF No. 54-5 at 9 of 15. By letter, Petco told Donlin it extended his leave through November 10, 2015, and to return the enclosed fitness-for-duty

8

certification by November 6th so they could re-evaluate his ability to return to work with or without reasonable accommodation. Pl.'s Dep. 164:16-165:5, ECF No. 52-1.

After his short-term disability benefits ended on August 22, 2015, UNUM considered whether Plaintiff qualified for long-term benefits as part of its roll over process, but it denied benefits on October 23, 2015, after determining he was able to perform the job's duties. *See* Pl.'s Dep. 165:6-11, 177:18-178:5, 183:17-21, 283:2-20, ECF No. 54-1; Def.'s Ex. 12, ECF No. 52-12. Three days later, Donlin indicated to Petco for the first time that he disagreed with Dr. Nunez's restrictions. Def.'s MSJ, UF ¶ 29, ECF No. 52. Donlin wrote Petco an email asking why he was not allowed to return to work, detailing what he thought were the deficiencies in the UNUM letter, and inquiring why UNUM is saying he could go to work but Petco is saying he can't. Pl.'s Dep. 185:1-189:17, ECF No. 54-1.

For a third time, in November 2015, Donlin submitted a return-to-work release in which Dr. Nunez continued some of Donlin's restrictions through February 10, 2016. Def.'s MSJ, UF ¶ 27, ECF No. 52; Pl.'s Resp., UF ¶ P, ECF No. 54. The restrictions were similar to those she previously prescribed and included no lifting, lowering, or carrying over 25 pounds; no pushing or pulling over 25 pounds; no exposure to chemicals; no repetitively bending or twisting at the waist; no walking, sitting, or standing for more than two hours each; no operating a hand truck; no flying or driving; no repetitive power gripping or grasping; no repetitive hand, wrist, or elbow motion; no climbing stairs or ladders. Def.'s MSJ, UF ¶ 27, ECF No. 52. These newer restrictions were in general less severe than those in August. Radcliffe Dep. 39:22-40:22, ECF No. 54-8.

Shaunteah Radcliffe, Petco's Leave of Absence & Accommodations Manager, submitted the restrictions to Mr. Hazlett and Mr. Coughlin and asked them to advise whether the restrictions could be accommodated. Pl.'s Resp., UF ¶ P, ECF No. 54; Radcliffe Dep. 27:13-28:13, ECF No.

54-8. For the first time, Petco decided it needed additional information regarding four of Plaintiff's restrictions and asked Donlin by email on November 9, 2015, what chemicals were restricted; whether the two-hour restrictions for walking, sitting, and standing meant two hours total for a work day, or after two hours of standing, could he take a rest break and resume standing; whether the hand-wrist-motion restriction included typing; and whether Donlin had reliable transportation. *See* Pl.'s Resp., UF ¶ Q, ECF No. 54; Radcliffe Dep. 29:20-31:22, ECF No. 54-8; Pl.'s Ex. 5, ECF No. 54-5 at 3, 5-6 of 15. The HR Business Partner had no other problems with any of Donlin's restrictions. Pl.'s Resp. ¶ R, ECF No. 54. Petco also attached a Request for Accommodation Packet ("RAP") that included a certification form with questions about Donlin's impairments and necessary accommodations for Plaintiff's physician to complete and return by November 30, 2015. *See* Pl.'s Ex. 5, ECF No. 54-5 at 5-6 of 15; Radcliffe Dep. 49:12-52:20, ECF No. 54-8.

Donlin forwarded the email to Mr. Chambers, noting that he wanted to discuss the past email he sent on October 26, 2015, and the recent correspondence from the Leave Team. *See* Pl.'s Ex. 5, ECF No. 54-5 at 4 of 15. Donlin complained that UNUM said he was qualified to return to work, but Petco was asking him to disclose his medical records and complete lengthy forms. *See id.* Donlin expressed his frustration that UNUM and Petco were contradicting one another and asked that the situation be fixed in a timely manner. *See id.*

Donlin responded to Petco that the RAP was a request for accommodation, and he did not need and was not requesting accommodation. Pl.'s Resp., UF ¶ X, ECF No. 54. He did not ask Dr. Nunez to complete the forms or clarify the restrictions she placed on his return to work, because he did not believe he needed any accommodations. *See* Def.'s MSJ, UF ¶ 35, ECF No. 52; Pl.'s Dep. 199:5-200:14, ECF No. 54-1. On November 20, 2015, concerned Petco did not intend to return him to work, Donlin filed an EEOC charge. Pl.'s Resp., UF ¶ V, ECF No. 54.

On December 10, 2015, Petco reminded Donlin by email that he needed to complete the forms and explained that they were requesting documentation to clarify and better understand his ability to return to work with or without accommodations. Def.'s Ex. 13, ECF No. 52-13 at 10-11 of 13. After Donlin again responded he was not requesting accommodations, Petco sent a follow up email telling him, "Your email indicates that you are not requesting accommodation, does this mean that the restrictions are no longer in place and that you have been released to full duty?" *Id.* at 8-9 of 13. Petco asked for either an updated release form from his doctor or, if restrictions were still in place, the completed accommodation forms, so they could continue interactive discussions. *Id.* at 9 of 13. Petco warned that if he failed to provide the information by December 17, 2015, it would assume he was voluntarily resigning, and he would be administratively separated. *Id.*

Donlin responded that he wanted to return to work with no accommodations, that he has a disability, and Petco has known of his disability. *Id.* at 6-8 of 13. Petco again asked if he still had the restrictions, and Donlin once more responded that he wanted to return to work with no accommodations. *See id.* at 5-6 of 13. Donlin believed he did not need accommodations because the restrictions did not prevent him from doing the essential tasks of the job. *See* Pl.'s Dep. 224:9-14, ECF No. 54-1. On December 22, 2015, Petco wrote Donlin again reminding him that if he was returning to work with no restrictions and/or accommodations, please provide a full-duty release note completed by his healthcare provider. *See* Def.'s Ex. 13, ECF No. 52-13 at 3-4 of 13. Donlin replied that he wanted to return to work with no accommodations, noting that UNUM's doctors found him qualified to perform the job. *Id.* at 3 of 13. On December 31st, Petco emailed him that it needed by January 8, 2016, either clarification of the restrictions from the November 6th fax or a full-duty release note, warning him again that failure to do so would result in administrative separation. *See id.* at 2-3 of 13. Donlin viewed the request for clarification of the four restrictions,

two of which were not job-related, to be a pretext designed to provide an excuse not to return him to work, so he declined to provide additional information. Pl.'s Resp., UF ¶ Z, ECF No. 54.

Petco notified Donlin that, because of his failure to cooperate with the documentation requirements to continue interactive discussions, his employment was administratively separated on January 9, 2016. Def.'s MSJ, UF ¶ 39, ECF No. 52. Because Petco never received the requested information on the four restrictions, it never offered any accommodation, did not decide whether he could return to work, and could not say which specific restriction prevented him from returning to work. *See* Radcliffe Dep. 44:2-46:23, 86:2-88:18, ECF No. 54-8.

## V.     Petco's Accommodation of Other Employees

It is not uncommon for Petco to accommodate lifting and climbing restriction for store employees without going through the formal RAP process. *See* Pl.'s Resp., UF ¶ K, ECF No. 54; Radcliffe Dep. 83:24-84:8, ECF No. 54-8. Nor has Petco required all employees to go through the RAP process for climbing restrictions. Radcliffe Dep. 84:9-25, ECF No. 54-8. Petco has accommodated employees by allowing them to return to work without having to kneel, crouch, or squat; without having to engage in repetitive bending or twisting at the waist; and with standing or walking limitations. Pl.'s Resp., UF ¶ K, ECF No. 54.

Charlene Block was a Petco general manager of a Colorado store with approximately 15-17 employees when she took FMLA leave after surgery for a broken ankle. *See* Block Dep. 3:20-4:25, 5:8-7:21, ECF No. 54-9; Pl.'s Resp., UF ¶ BB, ECF No. 54. At least three employees were in the store at any given time. Pl.'s Resp., UF ¶ FF, ECF No. 54. Prior to her disability, she worked for about a month with a boot, then a cast and crutches, with other staff available to perform certain functions she could not do at the time, such as lifting, stocking, unloading the trucks, or bringing customers supplies. *See id.*, UF ¶ CC; Block Dep. 7:10-10:18, ECF No. 54-9. Her manager did not

express any reservations about her ability to perform her job despite her physical limitations. Pl.'s Resp., UF ¶ GG, ECF No. 54.

When she returned to work after her recovery, she had to submit a return-to-work release form completed by her physician. *See id.* ¶ HH; Block Dep. 15:16-16:12, ECF No. 54-9. Petco did not require her to complete a RAP form. Pl.'s Resp., UF ¶ KK, ECF No. 54. Upon return, she had restrictions on wearing a splint or brace at work and of no more than 50 percent of her time walking; no more than 50 percent of the time standing; no flying; no driving an automobile; no using foot controls; no kneeling, crouching, or squatting; no climbing ladders; and no climbing stairs more than 50 percent of the time. *See* Pl.'s Ex. 10, ECF No. 54-10. Before returning to work, someone in the Leave Team called her and asked if she was comfortable returning to work with those restrictions. Pl.'s Resp., UF ¶ II, ECF No. 54. When she said she was, Petco allowed her to return to work. *Id.* Although Ms. Block voluntarily stepped down from general manager to guest experience leader, her duties were only slightly different than those for the general manager. Block Dep. 20:5-21:5, ECF No. 56-8. The restrictions did not affect her ability to do her job because she could perform the essential portions of her job and would ask another employee to help with tasks subject to her restrictions, such as lifting heavy items, unloading trucks, or stocking shelves. *See* Pl.'s Resp., UF ¶¶ EE, JJ, HH, ECF No. 54; Block Dep. 8:22-12:15, 17:5-19:23, ECF No. 54-9.

## **DISCUSSION**

Donlin brought claims against Petco for (I) violation of the NMHRA based on discrimination against him because of his physical handicap; (II) violation of the ADA for discriminating against him because of his disability; (III) violation of the FMLA for failing to restore him to his position after his physician certified him to return to work with restrictions; and (IV) retaliatory discharge for firing him in violation of public policy after he took leave to care for

13

his medical condition and did not permit his return to work until he provided a 100% fitness-for-duty certification. Petco moved for summary judgment on each of these claims. Defendant argues that it is entitled to summary judgment on Plaintiff's FMLA claim because he cannot establish that he could perform the essential functions of his job when his FMLA leave expired. According to Defendant, Plaintiff cannot succeed on his NMHRA and ADA claims because he refused to cooperate in the requisite interactive process and cannot show he was a qualified individual or that Petco acted with discriminatory intent. Finally, Defendant contends that Plaintiff's retaliatory discharge claim fails because it is not based on a specific expression of public policy for which no remedy is available at law and Petco's practices he opposed were not prohibited or condemned by public policy. This Court will first examine the merits of Plaintiff's FMLA claim.

## I. FMLA (Count III)

The FMLA makes it unlawful for an employer to interfere with, restrain, or deny the exercise or attempt to exercise any right provided under the FMLA. 29 U.S.C. § 2615(a)(1). An employee is entitled, upon returning from FMLA leave, to be restored "to the position of employment held by the employee when the leave commenced" or "an equivalent position." 29 U.S.C. § 2614(a)(1). An employer may condition restoring an employee who took FMLA leave because he was not able to perform his job on presentment of a certification from the employee's doctor that the employee is able to resume work, so long as the certification is part of a uniformly applied policy or practice for similarly situated employees. *See* 29 C.F.R. § 825.312(a).

"The employee has the same obligations to participate and cooperate (including providing a complete and sufficient certification or providing sufficient authorization to the health care provider to provide the information directly to the employer) in the fitness-for-duty certification process as in the initial certification process." *Id.* To show an employee is fit for duty, his health

care provider must certify that he can perform the identified essential functions of his or her job, and the employer is thereafter permitted to contact the health care provider for purposes of clarifying and authenticating the fitness-for-duty certification. *Id.* § 825.312(b). An employer may delay restoring the employee's employment until he submits the fitness-for-duty certification. *See id.* at § 825.312(e). The employer may terminate the employee's employment if, at the time his FMLA leave expires, he does not provide the fitness-for-duty certification stating that he is fit for duty and able to return to work. *See id.* § 825.313(d). An employer does not have to restore an employee who "is unable to perform an essential function of the position because of a physical or mental condition," but the ADA may govern the employer's duties. *Id.* § 825.216(c).

The ADA regulations in turn define essential functions as "the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1). In determining whether a particular function is essential, a court may consider the following factors, among others: the employer's judgment of what is essential; written job descriptions; the amount of time spent on the job performing the function; the consequences of not requiring the employee to perform the function; work experience of past employees in the job or current work experience of employees in similar jobs. *Id.* § 1630.2(n)(2). A court should give deference to the employer's judgment concerning a job's essential functions. *See Hawkins v. Schwan's Home Service, Inc.*, 778 F.3d 877, 888 (10th Cir. 2015). Courts should not second guess the employer's judgment when the job description is job-related, uniformly enforced, and consistent with business necessity. *See id.* (quoting *Mason v. Avaya Communications, Inc.*, 357 F.3d 1114, 1119 (10th Cir. 2004)). While an employer must come forward with evidence concerning whether a job requirement is essential, the plaintiff bears the burden of persuasion that

he was qualified to perform the job and the duties he could not perform were non-essential. *See id.* at 888-89, 893-95.

Consequently, to succeed on an interference claim, an employee must show that (1) he was entitled to FMLA leave, (2) an adverse action by his employer interfered with his right to take FMLA leave, and (3) this adverse action was related to the exercise or attempted exercise of the employee's FMLA rights." *Brown v. ScriptPro, LLC*, 700 F.3d 1222, 1226 (10th Cir. 2012) (citing *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1180 (10th Cir. 2006)). The second element is met if the employee shows he was denied reinstatement after taking leave. *Dalpiaz v. Carbon County, Utah*, 760 F.3d 1126, 1132 (10th Cir. 2014). Timing may inform the third factor. *Brown*, 700 F.3d at 1227. "If the employee can demonstrate that the first two elements of interference are satisfied, the employer then bears the burden of demonstrating that the adverse decision was not 'related to the exercise or attempted exercise of [the employee's] FMLA rights.'" *Dalpaiz*, 760 F.3d at 1132 (quoting *Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1287 (10th Cir. 2007)).[4] A deprivation of these rights is a violation regardless of the employer's intent, and the *McDonnell Douglas*[5] burden shifting analysis does not apply. *Brown*, 700 F.3d at 1226 (citing *Smith v. Diffee Ford–Lincoln–Mercury, Inc.*, 298 F.3d 955, 960, 963 (10th Cir. 2002)). An employer can defend against the interference claim, however, by showing that the employee would have been terminated or not restored to his position anyway, i.e. regardless of the request for FMLA leave. *Id.*

---

[4] Petco argues that the cases placing the burden of persuasion on Defendant for the third element are inapposite. Def.'s Reply 6, ECF No. 56. Based on its review of the law, the Court is not convinced the Tenth Circuit's analysis in *Dalpaiz* does not control. In any event, because inferences regarding the timing of events go in Plaintiff's favor, the Court would find that Plaintiff met his burden on the third element, if indeed, he has the burden of proof on all three elements.
[5] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Petco does not dispute that Donlin was entitled to FMLA leave. As for the second factor, Plaintiff submitted evidence that Petco denied his reinstatement when he submitted his return to work request in May 2015 at the end of his FMLA leave. Plaintiff has thus satisfied the first two elements. Turning to the third element, Plaintiff contends that Defendant cannot meet its burden because Plaintiff had a legal right to restoration at the end of his FMLA leave in May 2015 and Dr. Nunez's restrictions did not impede his ability to perform essential job functions. Defendant argues that Plaintiff's medical certifications show he could not perform his essential job duties when his FMLA leave expired, so its actions were not related to Plaintiff taking FMLA leave.

In May 2015, Plaintiff's Return to Work Release listed the following restrictions: (i) chemicals; (ii) walking less than 30 minutes per hour; (iii) standing less than 30 minutes per hour; (iv) operating hand truck; (v) flying; (vi) driving; (vii) lifting, lowering, carrying over ten pounds; (viii) kneeling, crouching or squatting; and (ix) repetitively bending/twisting at the waist. *See* Def.'s Ex. 8, ECF No. 52-8. According to Petco, the General Manager position required Donlin to sit, stand, and walk for long periods of time; twist, bend, kneel, crouch, and squat; climb ladders; lift and carry merchandise up to 50 pounds, multi-task, and concentrate, which he could not do at the time he exhausted his FMLA leave. Concentration and multi-task limitations, however, were not listed among the May 2015 restrictions.

Examining the written job description, all but one of the listed essential job functions arguably describe managerial duties that are not related to physical labor-type tasks. The seventh "essential" job function, however, is moving merchandise up to 50 pounds. *See* Def.'s Ex. 3, ECF No. 52-3 at 4 of 8. Moreover, under the "Work Environment" section, the description states that the position "requires bending, kneeling, moving merchandise (up to 50 pounds, as necessary) and standing for long periods of time" as well as occasional merchandise stocking and customer carry-

17

outs that require leaving the store briefly. *Id.* at 7 of 8. This job description is generally entitled to deference and indicates Petco's belief that moving merchandise, bending, kneeling, and standing for long periods of time were essential job functions.

Written job descriptions, however, are not the only evidence a court may consider in determining whether a function is essential. The court may also examine the amount of time spent on the job performing the task. Plaintiff testified that it was very rare for him to move merchandise, because there were always sales associates on the floor to help with such tasks. *See* Pl.'s Dep. 42:9-19, 288:14-289:9, ECF No. 54-1. It is undisputed that the Petco store Donlin managed had 20-25 total employees, and there were always at least four employees working in the store at any given time. Pl.'s Resp., UF ¶ LL, ECF No. 54. Plaintiff further testified that approximately 95% of his duties were performed in the office or were clerical tasks: scheduling, reading and filling out reports, gathering numbers on the sales floor and inputting them into a computer, inventory control, shrink control, overseeing the grooming salon, scheduling for the grooming salon and employee shifts, responding to emails, reading and responding to action memos, performing reviews and evaluations of employees. *See* Pl.'s Dep. 32:23-33:3, 37:3-39:2, ECF No. 54-1. He also indicated many of the clerical tasks of a general manager were performed sitting in the office. *See id.* at 289:1-9, ECF No. 54-1. Plaintiff's description of the amount of time on office or clerical-type work is also reflected in the written job description, in which a jury could find that most of the duties and responsibilities listed were managerial or clerical work. *See* Petco Job Description, ECF No. 52-3 at 4-7 of 8. This evidence, construed favorably to Plaintiff, suggests it was not essential for a General Manager to stand for longer than 30 minutes each hour and that Petco would

18

suffer few consequences by not requiring Plaintiff himself to move merchandise, bend, or kneel, rather than utilizing other store employees to do tasks requiring such actions.[6]

Additionally, Donlin contends that deference should not be given to the job description because Petco did not uniformly enforce the identified physical restrictions. It is undisputed that it is not uncommon for Petco to accommodate lifting and climbing restrictions for store managers and other employees on a frequent basis. *See* Pl.'s Resp., UF ¶ K, ECF No. 54; Puente-Sandoval Dep. 26:9-24, ECF No. 54-2. Similarly, it is undisputed that Petco has accommodated employees to allow them to return to work without having to kneel, crouch, or squat; without having to engage in repetitive bending or twisting at the waist; and with standing or walking limitations. Pl.'s Resp., UF ¶ K, ECF No. 54; Puente-Sandoval Dep. at 36:18-37:19, ECF No. 54-2. Petco reinstated Ms. Block, another general manager, even though she was not able to lift, stock, unload the trucks with supplies, or bring customers supplies during her period of disability, because other employees were available to assist with those tasks. *See* Block Dep. 7:10-10:18, ECF No. 54-9; Pl.'s Resp., UF ¶¶ CC, GG, ECF No. 54.

Relying on *Scruggs v. Pulaski County, Ark.*, 817 F.3d 1087 (8th Cir. 2016), Defendant argues that no jury could conclude that Plaintiff was able to perform the essential functions of the job based on Dr. Nunez's work restrictions. *Scruggs*, however, is distinguishable. In *Scruggs*, a juvenile detention officer with fibromyalgia and degenerative disc and cervical disease took FMLA leave when her health provider placed work restrictions on her that included "no sitting,

---

[6] This Court has limited its analysis of job duties to those that Defendant has focused on as being essential. Defendant does not appear to rely on the driving and chemical restrictions as essential. Nevertheless, the Court notes that there are facts upon which a jury could find that the driving and chemical exposure are non-essential. The job description's Work Environment section does not list exposure to chemicals in the workplace. Pl.'s Resp., UF ¶ S, ECF No. 54. Nor does the position include any responsibility for driving, and it was a violation of Petco's policy to refuse to return an employee to work if the employee was unsure if he had reliable transportation. Pl.'s Resp., UF ¶ T, ECF No. 54.

standing, bending, and stooping for extended periods" and no lifting more than 25 pounds. *Id.* at 1091. Because she did not provide a certification saying she could meet the job requirement of ability to lift up to 40 pounds, the county terminated her employment at the end of her FMLA leave. *See id.* The Eighth Circuit affirmed the decision granting summary judgment to the county on the plaintiff's ADA claim because the evidence established that she could not perform the essential functions of her job with or without reasonable accommodation where the ability to protect juveniles from harming themselves or others sometimes required lifting 40 pounds. *See id.* at 1091-93. In contrast to *Scruggs*, evidence in Donlin's favor, including the written job description and Petco's treatment of other employees, indicates that his job was largely office work that could be accomplished sitting or walking and standing for less than 30-minute increments, and that tasks requiring lifting or bending could be accomplished by other store employees, and thus, were not essential to the general manager position.[7]

Defendant also relies on *Glover v. DCP Midstream GP, LLC*, in which the Tenth Circuit considered an FMLA interference claim where an employee took his full FMLA leave, his employer extended his leave under its sick leave benefit program, but at the end of the extended leave, he was not reinstated. 549 F. App'x 713, 714-15 (10th Cir. June 13, 2013) (unpublished). The Tenth Circuit concluded that "because he received the leave due to him under the FMLA, but was unable to return to work at the end of this leave, his interference claim fails." *Id.* at 715. Again,

---

[7] Petco also relies on a comparison of Donlin's FMLA leave certification form listing medical conditions and restrictions supporting FMLA leave with medical restrictions in his return to work form, arguing their similarities belie Plaintiff's contention that he could return to work. Compare Def.'s Ex. 6 & 7, ECF No. 52-6 & 52-7, with Def.'s Ex. 8, ECF No. 52-8. Because a jury may examine the same evidence and find that his condition had changed sufficiently that he could return to work, the Court finds a question of fact exists as to whether the forms are inconsistent with Plaintiff's claims.

here there is a fact question as to whether Plaintiff could return to work and perform the essential duties of his job in May 2015. Consequently, *Glover* is likewise distinguishable.

Finally, Defendant argues that Plaintiff never expressed disagreement with Petco's decision in May 2015 that he could not perform his job and to continue leave as an accommodation. Moreover, Petco contends that Donlin applied for disability benefits, affirmatively asserting he could not work. Defendant, however, has not disputed that Plaintiff requested reinstatement to his position when he submitted the return to work form in May 2015 and Petco denied Plaintiff reinstatement. Moreover, evidence in Plaintiff's favor indicates that his manager told him he could not return unless he was 100% fit for duty and that he complained to Randy Chambers on May 7, 2015, among other things, that he was informed that he could not work and Petco may not have a position for him when he came back. A reasonable jury could determine that Petco discouraged Donlin from making further objections by suggesting discussions were futile. A jury may also find that, because Petco said he had to be 100% fit for duty, that applying for disability benefits is not inconsistent with his request to return to work. Accordingly, the Court is not convinced that Plaintiff's failure to continue to contest the denial of reinstatement in May 2015 and accepting disability benefits forecloses his FMLA claim. *Cf. Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 608 (3d Cir. 2006) (concluding that, because statements in support of application for long-term disability benefits did not state categorically that employee could not work at all or take into account her entitlement to reasonable accommodation, there was no inconsistency between these statements and ADA claim, and thus she was not estopped from pursuing ADA claim).

Viewing the evidence in the light most favorable to Plaintiff, a question of fact exists for the jury as to whether Dr. Nunez's listed restrictions prevented Plaintiff from performing the essential functions of the job, whether Plaintiff was entitled to reinstatement at the end of his

FMLA leave in May 2015, and whether Petco's failure to reinstatement him was related to the exercise of his FMLA rights. The Court will thus deny Defendant's request for summary judgment on Plaintiff's FMLA claim.

## II.      NMHRA (Count I) and the ADA (Count II)

Plaintiff's NMHRA and ADA claims are based on the following alleged conduct of Petco: (1) refusing to return him to his position when he requested to return to work, (2) requiring him to submit a RAP before allowing him to return to work, even when he was not requesting accommodation, and (3) terminating his employment. *See* Compl. ¶¶ 31, 39, ECF No. 1-1. Analyzing Donlin's state NMHRA claims together with his federal ADA claims is consistent with the New Mexico Supreme Court's looking to "federal civil rights adjudication for guidance in interpreting the NMHRA." *Ocana v. Am. Furniture Co.*, 2004-NMSC-018, ¶ 23, 135 N.M. 539. The ADA prohibits employers from discriminating against "a qualified individual on the basis of disability in regard to … discharge of employees … and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Unlawful discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." *Id.* § 12112(b)(5)(A). Reasonable accommodations are defined as "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii).

To determine a reasonable accommodation, it "may be necessary" for an employer to start an "informal, interactive process" with the employee in need of accommodation. 29 C.F.R. § 1630.2(o)(3). The purpose of the interactive process is to identify limits caused by the employee's disability and potential reasonable accommodations that can overcome those limitations. *Id.* This process requires both parties to participate. *Templeton v. Neodata Services, Inc.*, 162 F.3d 617, 619 (10th Cir. 1998). "An employer cannot be expected to propose reasonable accommodation absent critical information on the employee's medical condition and the limitations it imposes." *Id.* at 619. The interactive process is not an end in itself; rather, the employee must show that the employer's failure to adequately engage in the interactive process resulted in its failure to fulfill its role in determining what specific actions it must take to provide the qualified individual a reasonable accommodation. *Rehling v. City of Chicago*, 207 F.3d 1009, 1015-16 (7th Cir. 2000).

When a plaintiff does not have direct evidence of discrimination, the courts use the *McDonnell Douglas* burden-shifting framework to determine an ADA discrimination claim based on a disability. *See Lincoln v. BNSF Railway Company*, 900 F.3d 1166, 1192 (10th Cir. 2018). To establish a prima facie case of discrimination under the ADA, a plaintiff may show that at the time of the adverse employment action (1) he was qualified for his job; (2) he could perform the job's essential functions with a reasonable accommodation for his disability; and (3) his employer failed to provide a reasonable accommodation despite his request. *Hwang v. Kansas State University*, 753 F.3d 1159, 1161 (10th Cir. 2014). Under the ADA, a person is qualified for the job if he, with or without reasonable accommodation, can perform the essential functions of the job. *Lincoln*, 900 F.3d at 1192 (quoting 42 U.S.C. § 12111(8)). If the plaintiff sets forth a prima facie case of disability discrimination, the burden shifts to his employer to articulate a legitimate, nondiscriminatory reason for not restoring the employee to his position. *Id.* at 1193. If the employer

23

establishes a satisfactory reason, the burden again shifts to plaintiff to show the reason given was pretext for discrimination, such as by demonstrating weaknesses, implausibilities, inconsistences, or contradictions in the reason to show it is unworthy of belief. *Id.*

### A.  Whether Donlin established a prima face case of discrimination

Defendant does not contest for purposes of this motion that Plaintiff has a disability. *See* Def.'s MSJ 19 n. 3, ECF No. 52. Instead, Petco challenges the second and third prongs – whether Donlin was qualified for the job and whether he was unlawfully discriminated against because of his disability. Defendant contends that Plaintiff has no evidence beyond his own self-serving statements that he was able to perform the essential functions of his job, with or without accommodation. According to Defendant, that Dr. Nunez listed work restrictions and that Plaintiff applied for and accepted disability benefits are facts inconsistent with Plaintiff's statements that he was able to work. Additionally, Defendant contends that there is no evidence of discriminatory intent by Petco when it did not restore him to the General Manager position and when it terminated his employment because Petco reasonably relied on Dr. Nunez's medical restrictions when determining Donlin could not return to work.

As discussed in the FMLA section, a reasonable jury could find from the evidence in Plaintiff's favor that in May 2015 Petco had the necessary evidence it needed to determine that Plaintiff could return to work with the restrictions in place and perform all essential duties; but instead, it cut off the interactive process by telling him he could only return if 100% fit for duty. Viewing the evidence in the light most favorable to Plaintiff, a jury may find that Petco did not attempt to find potential reasonable accommodations that could overcome the listed limitations and that merely extending his leave and giving disability benefits to him when he wanted to return to work were not reasonable accommodations. The Court thus finds that Plaintiff has made a prima

facie ADA claim based on Petco's failure to reinstate him to his position in May 2015. As for whether Plaintiff satisfied a prima facie case of ADA discrimination regarding Petco's actions following its receipt of Donlin's July and November 2015 Return to Work Releases, the Court will assume, without deciding, that Plaintiff met his burden and will turn to Petco's proffered reasons.

**B. Whether Petco had legitimate non-discriminatory reasons for refusing to return Donlin to his position in May, August, and November 2015, requiring him to submit a RAP, and terminating his employment for not submitting a RAP or whether they were pretextual**

Petco contends it was legitimate to deny Donlin reinstatement because Petco believed he was not able to perform the essential duties of his job and he accepted short-term disability benefits without objecting that he should have been accommodated. Furthermore, Petco asserts it was appropriate to fire him for refusing to provide it necessary information in the interactive process. According to Petco, when Plaintiff asked to start working again after UNUM denied his long-term disability benefits, Petco responded by engaging Plaintiff to get more information to evaluate the severity of his disability and determine whether a reasonable accommodation could be made. Petco argues that, because Plaintiff only responded that he wanted to work without accommodation, without answering Petco's requests for clarification, Plaintiff's response amounted to a refusal to engage in the interactive process.

A plaintiff generally may establish pretext in three ways: evidence that the employer's stated reason was false; (2) evidence that the employer acted contrary to written company policy; or (3) evidence that plaintiff was treated differently than other similarly situated employees. *Dewitt v. Southwestern Bell Tel. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017). A plaintiff must submit evidence that the employer did not really believe its proffered reasons. *Id.*

**1. Failure to reinstate Donlin to his job on May 10, 2015**

Based on a favorable view of Plaintiff's evidence, a reasonable jury could find Plaintiff was qualified and able to perform the essential functions of his job in May 2015, even with his listed medical restrictions. While Donlin's May 2015 restrictions and Ms. Block's are not identical, a jury could view them as similar in that they pertain to physical-labor type duties that were not essential to their managerial positions. Moreover, according to Donlin, in May 2015, Petco did not seek additional clarifying medical information; instead, it told Plaintiff that he must submit a return-to-work release without restrictions to come back to work and that Plaintiff only accepted the benefits because Petco refused to further engage in interactive discussions to restore him to work. A reasonable jury may find that Donlin wanted to return to work; his employer led him to believe it would be futile to engage in discussions unless he had no work restrictions, whether or not his restrictions pertained to essential functions; that Petco did not have an interest in accommodating his disability; and that an extension of leave does not constitute a reasonable accommodation under those circumstances.

In support of its position that it is entitled to summary judgment, Petco relies on *Templeton*. In *Templeton*, an employee took leave after sustaining serious injuries in an automobile accident. 162 F.3d at 618. After trying unsuccessfully to return to work, her doctor informed her employer that the chance she might return to work full time was "only fair." *See id.* Subsequently, her employer sent a job description and physician certification form, but despite repeated warnings, she failed to provide the certificate and her employer terminated her employment. *Id.* at 618-19. Affirming the district court's grant of summary judgment on the employee's ADA claim, the Tenth Circuit concluded it was clear under the undisputed facts that the employer reasonably requested information it needed to determine appropriate accommodation in the event the employee was able

26

to return to work. *Id.* at 619. The ruling relied on the fact that the medical information was necessary to the interactive process and of the type that only the employee could provide. *See id.*

In contrast to *Templeton*, Petco had Dr. Nunez's opinions that Donlin could return to work on May 10, 2015, if the listed medical restrictions were accounted for. While an employer cannot be expected to propose reasonable accommodation absent critical information on the employee's medical condition and the limitations it imposes, *see id.*, in this case there is a dispute of fact as to whether Petco already had the critical information on Donlin's medical condition that it needed in May 2015 to determine whether the restrictions impeded his ability to perform the essential tasks of the job. Moreover, evidence in Plaintiff's favor shows that Donlin complained to Randy Chambers, but Petco did not consider if there were reasonable accommodations for his restrictions or whether the restrictions pertained to non-essential tasks. Evidence in Plaintiff's favor suggests that Petco did not individually determine which restrictions could or could not be accommodated in May 2015, and thus, that it did not fulfill its "duty to engage with him in a good faith effort to identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Bartee v. Michelin North America, Inc.*, 374 F.3d 906, 916 (10th Cir. 2004) (internal quotations omitted) (concluding there was enough evidence for jury to find employer failed to reasonably accommodate employee's disability where it did not inquire about his restrictions or accommodations that he needed to perform position). Accordingly, as to Plaintiff's NMHRA and ADA claims based on Petco's failure to restore Donlin to his position in May 2015, questions of fact preclude granting Defendant summary judgment.

### 2.  Failure to reinstate Donlin to his job on August 10, 2015

According to Plaintiff, evidence demonstrates that Petco's stated reason for refusing to reinstate him to work on August 10, 2015 was false and unworthy of belief. On July 21, 2015, Dr.

Nunez completed a Return to Work Release for Donlin with a return date of August 10, 2015, but she listed numerous additional restrictions: excessive noise; using foot controls; standing for more than 15 minutes at a time; repetitive power gripping/grasping; reaching above shoulder level; climbing stairs or ladders; repetitive hand, wrist or elbow motion, and most significantly, a restriction to avoid tasks that require fine attention to detail. *See* Def.'s Ex. 10, ECF No. 52-10. A jury, even viewing the record favorably to Plaintiff, could only reasonably find that the new avoiding fine attention to detail restriction alone would impede Plaintiff's ability to do at least one of the essential job functions of a General Manager. Plaintiff's own description of his managerial job was that it constituted 95% clerical tasks that included reading and filling out reports, gathering numbers on the sales floor and inputting them into a computer, inventory control, shrink control, scheduling for the grooming salon and employee shifts, responding to emails, reading and responding to action memos, performing reviews and evaluations of employees. Given Donlin's restriction to avoid fine attention to detail, Petco had legitimate reasons for not reinstating him on August 10, 2015.

Because fine attention to detail would impede Plaintiff's ability to perform essential functions, he must show he could have performed those functions with or without reasonable accommodation. *See Alexander v. Northland Inn*, 321 F.3d 723, 727 (8th Cir. 2003). Plaintiff has not brought forth evidence that he was able to perform his managerial tasks at the time he was unable to concentrate on fine details. Although Plaintiff relies on evidence that Petco's own Employee Relations Manager expressed the belief that Petco probably could have accommodated him, that evidence was limited to Plaintiff's attempt to return to work in May 2015 when most of

his restrictions were physical. *See* Nordmann Dep. 9:13-10:14, 18:20-20:1, ECF No. 54-11; Notes of Suzanne Nordmann, ECF No. 54-12.[8]

Turning to Plaintiff's evidence of differential treatment, while a jury could find that Ms. Block was similarly unable to do many of the same physical labor tasks as Donlin, her restrictions undisputedly did not include an avoidance of tasks needing attention to fine detail, in contrast to Plaintiff's August 10, 2015 restrictions. Petco's treatment of Ms. Block is thus not comparable to Petco's treatment of Donlin in August 2015. Moreover, there is no evidence Petco often accommodated a restriction on fine attention to detail for any employee, let alone a manager.

Finally, to demonstrate pretext, Plaintiff points to evidence indicating Petco did not follow its own policies of engaging in an interactive process to determine a reasonable accommodation. Unlike in May 2015, Plaintiff's restriction on avoiding fine attention to detail clearly implicated his ability to perform numerous essential duties of a manager, such as meeting and managing store profitability projections and shrink budgets; completing and submitting all accounting and inventory management and payroll reports; reconciling daily grooming reports; cash counting and ensuring cashier drawers balance at the end of the shift. *See* Def.'s Ex. 3, ECF No. 52-3 at 4-5 of 8. The interactive process is not an end in itself; rather, Donlin must show that Petco's failure to adequately engage in the interactive process resulted in its failure to fulfill its role in determining what specific actions it must take to provide the qualified individual a reasonable accommodation. *Rehling*, 207 F.3d at 1015-16. Plaintiff has not suggested any sort of reasonable accommodation that could have been made regarding avoiding fine attention to detail that would have enabled him

---

[8] Specifically, the note stated: "**Why couldn't they accommodate back in May?** Most of restrictions then were physical and his job has more admin at least per JD. Seems he could have done (7/21 note has restrictions that we can clearly argue he cannot do)." Notes of Suzanne Nordmann, ECF No. 54-12 at 2 of 2.

to perform all the essential functions of his job. A reasonable jury could not conclude that Petco's explanation for not returning Donlin to his job on August 10, 2015 was unworthy of belief.

### 3. Requiring Donlin to submit a RAP in November 2015 and terminating his employment for failing to submit the requested paperwork

Plaintiff argues that Defendant's reason for terminating him was pretextual because the four restrictions about which Petco sought more information were non-work related. Viewing the evidence in Plaintiff's favor, Donlin's condition improved in the fall of 2015. In November 2015, Dr. Nunez removed restrictions for fine attention to detail, excessive noise, and using foot controls, kneeling, crouching, or squatting, and reaching above shoulder level; reduced his walking, sitting, and standing restrictions to up to two hours; and raised his lifting and carrying and pushing and pulling restriction to up to 25 pounds. *Compare* Def.'s Ex. 10, ECF No. 52-10, *with* Def.'s Ex. 11, ECF No. 52-11. Importantly, however, the November 10, 2015 medical restrictions, like the August 10, 2015 restrictions (and unlike the May 2015 restrictions), continued a restriction on repetitive hand, wrist, or elbow motion. After Donlin told Petco that he disagreed with Dr. Nunez's restrictions, Petco inquired about four of the restrictions, including asking whether Dr. Nunez's hand-wrist-motion restriction included typing.

An employer cannot be expected to propose reasonable accommodation absent critical information on the employee's medical condition and the limitations it imposes. *Templeton*, 162 F.3d at 619. Plaintiff argues that this inquiry was specious because the restriction did not affect any of Plaintiff's job requirements as set forth in the job restrictions, and thus, did not affect an essential job function. While the General Manager job description does not include "typing" in its list, its first listed essential job function is interacting through verbal *and written* communication with all professional contacts. *See* Petco Job Description, ECF No. 52-3 at 4 of 8. Donlin testified

that 95% of his duties were office or clerical tasks, including tasks that indicate the need to type – filling out reports, responding to emails and action memos, completing and submitting all accounting and payroll reports. *See* Pl.'s Dep. 37:3-39:2, ECF No. 54-1; Def.'s MSJ, UF ¶ 3, ECF No. 52. Petco had a legitimate reason to believe that the repetitive hand, wrist, or elbow motion restriction might pertain to typing and the clerical tasks that the job largely entailed.

In contrast to the events in May 2015, *Templeton* is more instructive when analyzing Petco's actions in November 2015. As in *Templeton*, Petco needed the requested information to determine the appropriate accommodation, if any, for the repetitive hand, wrist, or elbow motion restriction because it potentially pertained to Plaintiff's essential job duties. Consequently, at least some of the medical information Petco sought was necessary to the interactive process and of the kind that only the employee or his doctor could provide. It is undisputed that Plaintiff refused to give that medical information to Petco despite repeated written notices of Petco's need for the information and warnings of the consequences for failing to provide it.

With respect to Plaintiff's evidence of differential treatment, while a jury could find that Ms. Block was similarly unable to do many of the same physical labor tasks as Donlin, her restrictions undisputedly did not include a repetitive hand, wrist, or elbow motion restriction. Petco's treatment of Ms. Block is thus not comparable to Petco's treatment of Donlin in November 2015. Moreover, Plaintiff did not submit evidence showing that Petco frequently made accommodation for other managers for repetitive hand, wrist, or elbow motion restrictions without asking for clarifying information.

Even viewing the evidence in Plaintiff's favor, a reasonable jury could not find evidence of pretext to cast doubt on Petco's legitimate, non-discriminatory reason to require him to submit a RAP after receiving his November 2015 Return to Work Release, and ultimately terminating his

31

employment for his failure to provide needed clarifying information pertaining to his ability to carry out essential job functions. Petco is therefore entitled to summary judgment based on the theory that it violated the ADA and NMHRA by requiring him to submit a RAP and in terminating his employment for failure to do so. *Cf. Steffes v. Stepan Co.*, 144 F.3d 1070, 1072-73 (7th Cir. 1998) (determining that, given blanket nature of chemical restrictions and legitimate exposure issues raised by employer, duty fell to employee to update or further clarify the kinds of work she could do and level of chemical exposure, if any, she could tolerate, and failure to do so meant employer could not be held liable for failing to provide reasonable accommodations).

### C.  Summary judgment rulings regarding ADA and NMHRA claims

Plaintiff's ADA and NMHRA claims are based on three acts – refusing to return Plaintiff to his position, requiring him to submit a RAP when he needed no accommodation, and terminating his employment. *See* Compl. ¶ 39, ECF No. 1-1. Because this Court finds questions of fact exist as to the first act – whether Petco violated the NMHRA and ADA in May 2015 when it did not reinstate Plaintiff to his position – the Court will deny Defendant summary judgment on Plaintiff's ADA and NMHRA claims arising from that specific act. The Court, however, will grant Petco summary judgment on the claims to the extent they arise solely from the acts of requiring Donlin to submit a RAP and terminating his employment for failure to submit needed clarifying information. The Court is not prepared to say at this juncture what the combined effect of these rulings portends for causation and damages in this case and will not delve into these issues herein because they were not briefed.

### III.    Common Law Retaliatory Discharge (Count IV)

New Mexico recognizes a limited exception to the employment at-will rule in which a discharged at-will employee may recover in tort "when his discharge contravenes a clear mandate

of public policy." *Chavez v. Manville Products Corp.*, 108 N.M. 643, 647, 777 P.2d 371, 375 (1989). Retaliatory discharge is a narrow exception to the rule of employment at will. *Shovelin v. Central New Mexico Elec. Co-op., Inc.*, 115 N.M. 293, 850 P.2d 996, 1007 (N.M. 1993). To prevail on a retaliatory discharge claim, an employee must (1) identify a specific expression of public policy his termination violated; (2) show that he acted in furtherance of the clearly mandated public policy; and (3) demonstrate that the employer terminated his employment as a result of those acts. *Sherrill v. Farmers Ins. Exchange*, 2016-NMCA-056, ¶ 9, 374 P.3d 723.

The linchpin of the retaliatory discharge tort "is whether by discharging the complaining employee the employer violated a clear mandate of public policy." *Shovelin*, 850 P.2d at 1006 (internal quotations omitted). "A clear mandate of public policy sufficient to support a claim of retaliatory discharge may be gleaned from the enactments of the legislature and the decisions of the courts" and may fall into one of the following categories:  (i) legislation defining public policy and providing a remedy for violation of that policy; (ii) legislation providing protection of an employee without specifying a remedy; (iii) legislation defining a public policy without specifying either a right or remedy, requiring judicial recognition of both; and (iv) instances where there is no expression of public policy and the judiciary would have to imply a right and remedy. *Id.* As for laws defining public policy and providing a remedy, the New Mexico Supreme Court cited the NMHRA as an example. *Id.* Not every expression of public policy, even if set forth in a statute, will suffice to state a claim for retaliatory discharge. *Id.* The employee must identify a specific expression of public policy in order to state a claim. *See id.* at 1006-07.

Petco first argues that the NMHRA, ADA, and FMLA provide adequate remedies, and thus, the wrongful discharge tort does not permit recovery. A plaintiff, however, can bring a claim for the tort of retaliatory discharge based on his termination for requesting FMLA leave, despite

remedies provided in these other statutes. *Cf. Gandy v. Wal-Mart Stores, Inc.*, 117 N.M. 441, 443-45, 872 P.2d 859 (1994) (holding that plaintiff may bring retaliatory discharge tort when she alleges she was fired for having sought relief against her employer under NMHRA); *Cordova v. New Mexico*, 283 F.Supp.3d 1028, 1047-48 (D.N.M. 2017) (denying motion to dismiss wrongful termination claim based on allegations that defendants' actions violated FMLA).

Defendant next asserts that Plaintiff did not identify the specific expression of public policy over which he was terminated, instead only referring generically to the NMHRA, ADA, and FMLA. Based on *Gandy*, the Court finds Plaintiff has sufficiently identified the expression of public policy in these statutes because his claims are based on having been fired for using FMLA leave. Additionally, Defendant argues that Plaintiff's retaliatory discharge claim fails if the termination did not violate the FMLA, ADA, or NMHRA. As explained previously, the FMLA, NMHRA, and ADA claims may go before a jury on whether Petco violated those statutes when it failed to reinstate Donlin to his job in May 2015.

Finally, Petco contends that there is no evidence Donlin opposed any practice that public policy supports. According to Petco, Donlin's refusal to provide clarifying information concerning his return-to-work form, which led to his termination of employment, is not an act in furtherance of clearly mandated public policy. As discussed above, the Court agrees with Petco that it did not violate the ADA or NMHRA when it asked for clarifying information in November 2015, and for terminating his employment for repeatedly failing to provide the needed information. Plaintiff, however, also asserts that he was fired for using FMLA leave and attempting to return to work following the end of his leave in May 2015, which are acts that the FMLA, ADA, and NMHRA encourage.

Petco in its motion for summary judgment did not expressly argue that Donlin cannot satisfy the third element of the retaliatory discharge claim – the causal connection between the employee's protected actions and the termination. The Court is allowing Donlin's FMLA, ADA, and NMHRA claims to proceed based only on Petco's failure to reinstate Plaintiff in May 2015. Given the intervening events that occurred between May 2015 and his termination in January 2016, a causation issue arises as to whether Petco terminated Donlin's employment as a result of the alleged failure to reinstate in May 2015. The Court, however, is disinclined to resolve any causation issues without the benefit of briefing. Because of the changed posture of the case following entry of this Memorandum Opinion and Order, the Court requests that the parties submit additional briefing within 30 days from the filing this Memorandum Opinion and Order on the issue of causation, specifically whether Petco terminated Donlin's employment as a result of its failure to reinstate him in May 2015 or whether intervening events broke the causal chain. Accordingly, the Court will reserve ruling on whether Petco is entitled to summary judgment on the retaliatory discharge claim until the Court has an opportunity to review the additional briefs.

**IT IS THEREFORE ORDERED** that Defendant's *Motion for Summary Judgment* (**ECF No. 52**) is **GRANTED IN PART AND DENIED IN PART** as follows:

1. Defendant's request for summary judgment on Plaintiff's claims for violation of the FMLA, NMHRA, and ADA is **DENIED** to the extent the claims arise from Petco's failure to reinstate Donlin to his position on May 10, 2015.

2. Defendant's request for summary judgment on Plaintiff's claims for violation of the FMLA, NMHRA, and ADA is **GRANTED** to the extent the claims rely on the theory that Petco unlawfully failed to reinstate him in August 2015 and unlawfully terminated his

employment in January 2016 for failing to provide clarifying information on his work restriction.

3. The Court will **RESERVE RULING** on Defendant's request for summary judgment on Plaintiff's claim for retaliatory discharge. The parties must submit additional briefs, not to exceed twelve pages in length, **within 30 days** from the filing this Memorandum Opinion and Order that address the issue of whether Petco terminated Donlin's employment as a result of its failure to reinstate him in May 2015 or whether intervening events broke the causal chain.

4. The Court will re-set this case for trial by separate notice.


_____
SENIOR UNITED STATES DISTRICT JUDGE